SMITH, Auditor, v. JACKSON.

(Circuit Court of Appeals, Fifth Circuit. February 15, 1917.)

No. 2997.

1. MANDAMUS ⬡141—JURISDICTION—DISTRICT COURT OF CANAL ZONE.

Under the provisions of the Panama Canal Act, Aug. 24, 1912, c. 390, § 8, 37 Stat. 565 (Comp. St. 1916, § 10044), the District Court of the Canal Zone has jurisdiction to issue a peremptory writ of mandamus where a proper case is presented within Code Civ. Proc. Canal Zone, § 552.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 276–278.]

2. UNITED STATES ⬡81—OFFICERS—POWERS AND DUTIES—AUDITOR OF PANAMA CANAL.

Under the Panama Canal Act and the executive order of January 27, 1914 (Executive Orders 1904–1915, p. 330) as amplified by that of March 2, 1914 (page 340), promulgated in pursuance thereof and which became a part of the act, the auditor of the Panama Canal is the legal custodian of the funds of the Canal and of the Canal Zone, and is exclusively charged with their disbursement, being required to report only to the President and to Congress.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 64.]

3. MANDAMUS ⬡102(2)—AUDITOR OF PANAMA CANAL—DISCRETION.

Where the incumbent of an office in the Canal Zone created by the Panama Canal Act, with a fixed salary, has performed the duties which entitle him to a payment of salary, and Congress has appropriated the money for the same, the duty of the auditor of the Canal to issue a warrant therefor is a ministerial duty, and he has no discretion to withhold such warrant on a claim that the officer is indebted to the United States.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. §§ 218, 219, 221.]

4. UNITED STATES ⬡82—OFFICERS—AUTHORITY AND POWERS—COMPTROLLER OF TREASURY.

The salary of a judge who has served under an appointment made by authority of an act of Congress, which has also fixed his compensation and appropriated money for its payment, is not a claim against the government subject to the provisions of the Dockery Act July 31, 1891, c. 174, § 8, 28 Stat. 207 (Comp. St. 1916, § 425), which authorizes disbursing officers to submit any question involving a payment to be made by them to the Comptroller of the Treasury for decision, but is a demand fixed by the law which no executive officer of the government has power to withhold or diminish.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 65.]

5. UNITED STATES ⬡82—OFFICERS—AUTHORITY AND POWERS—COMPTROLLER OF TREASURY.

Such provision applies only to claims against the government the validity of which may be questioned by a disbursing officer, and the assertion by him of an unadjudicated cross-claim on behalf of the government, which he seeks to deduct from the fixed salary of a federal judge, raises no question which the comptroller is given authority to decide.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 65.]

6. UNITED STATES ⬡41—OFFICERS—DUTIES—AUDITOR OF PANAMA CANAL.

The executive order of January 27, 1914, as amplified by that of March 2, 1914, promulgated by the President pursuant to express authority given by the Panama Canal Act, is in legal contemplation an integral part of such act, and the duties of the auditor of the canal therein pro-

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vided for are statutory, and not merely pertaining to administrative detail.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 30.]

7. JUDGES ⬤�old22(3)—SALARY—AUDITOR OF PANAMA CANAL.

Act Oct. 22, 1913, c. 32, 38 Stat. 209 (Comp. St. 1916, § 423), provides that "the money accounts of the Panama Canal, under the Panama Canal Act * * * shall continue to be audited by the auditor of the War Department." The executive order of January 27, 1914, provided for by the Canal Act, and which put it into effect, provides for an accounting department under the supervision and direction of an auditor on the Isthmus charged with the administrative examination of such accounts as are required to be submitted to the Treasury Department, and "the collection, custody and disbursement of funds of the Panama Canal and the Canal Zone." The Sundry Civil Appropriation Act (Act March 3, 1915, c. 75, 38 Stat. 883), provided for the payment of the salary of the District Judge of the Canal Zone and appropriated money for the purpose. Held, that in so far as there was any conflict between them, the executive order superseded the act of October 22, 1913, and that the auditor of the canal was charged with the duty of auditing and paying the salary of the District Judge.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 78, 179.]

8. MANDAMUS ⬤�old71—SUBJECTS AND PURPOSES OF RELIEF—MINISTERIAL ACTS.

Where a plain ministerial duty is imposed on an executive officer, leaving nothing to his judgment or discretion, and he refuses to act under such circumstances, mandamus is appropriate to compel him to perform his duty.

[Ed. Note.—For other cases, see Mandamus, Cent. Dig. § 133.]

9. UNITED STATES ⬤➙125—JURISDICTION OF FEDERAL COURTS—ACTION AGAINST UNITED STATES.

An action for mandamus to compel an official of the United States to do his plain ministerial duty under the laws is not an action against the United States, and is within the jurisdiction of a federal court.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 113, 114.]

10. JUDGES ⬤➙22(6)—COMPENSATION OF FEDERAL JUDGES—"EMOLUMENTS."

Section 8 of the Panama Canal Act provided that when it was put into effect by executive order there should be established in the Canal Zone a district court with a district judge who during his term should reside within the Zone and should receive the same salary as district judges in the United States, and no emoluments except such salary. There are no houses in the Canal Zone except those owned by the government, nor are others permitted. Those of the government were built for the use of employés of the Canal and the Panama Railroad Company and other functionaries of the United States, to whom they were furnished without charge except for a period of less than three months, during which, by executive order, employés of the canal and railroad were charged a rental. The judges serving during government by the Canal Commission were furnished quarters or houses without charge. Held, that the furnishing of a house rent free to the district judge appointed under the Canal Act was not an "emolument" in violation of the act, but a necessary incident to his compliance with his duty to reside in the Zone, and that, in the absence of any law or executive order requiring the payment of rent therefor, there was no authority to exact it from him (quoting Words and Phrases, Emoluments).

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 81, 179.]

11. JUDGES ⬤➙22(5)—SALARIES OF FEDERAL JUDGES—DEDUCTIONS.

An executive department of the United States has no authority to make a deduction from the salary of a federal judge, fixed by law and

for which an appropriation has been made by Congress, because of a claimed indebtedness from him to the government.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 80, 179.]

In Error to the District Court of the Canal Zone; Henry D. Clayton, Judge.

Mandamus by William H. Jackson, relator, against H. A. A. Smith, Auditor of the Panama Canal. Writ granted, and defendant brings error. Affirmed.

The petition for the writ of mandamus in this case was filed in the District Court of the Canal Zone, Balboa Division, on April 3, 1916, by William H. Jackson, relator, against H. A. A. Smith, auditor of the Panama Canal, respondent.

Shortly thereafter the relator herein, who is also the judge for the District Court of the Canal Zone, filed his disqualification to act as judge in the case by reason of his pecuniary interest therein. Before the matter came on for trial, the President, in pursuance of the authority conferred by Panama Canal Act, Aug. 24, 1912, 37 Stat. L. 560, designated Hon. Henry D. Clayton, United States District Judge for the Middle and Northern Districts of Alabama, to perform the duties of the judge of the District Court of the Canal Zone in the trial of this case, and also to perform the duties of said judge while such judge was absent on leave from the Canal Zone.

The relator in his petition as amended averred that he was the duly appointed, qualified, and acting judge of the District Court of the Canal Zone; that the act of Congress providing for the government of the Canal Zone, known as the Panama Canal Act, declares that the District Judge of the Canal Zone shall receive the same salary paid to the District Judges of the United States, that is the sum of $6,000 per annum, payable in monthly installments of $500 each; that Congress had appropriated funds for the payment of his salary, and that said funds were available for that purpose; that the respondent Smith was the duly appointed, qualified, and acting auditor of the Panama Canal; that it was the duty of said Smith, as auditor, to issue and deliver to the relator each month a voucher or warrant for the salary due relator; that notwithstanding the relator had well and truly performed his duties as judge of said court during the times mentioned in the petition, the said Smith, as auditor, failed and refused to issue and deliver to relator salary due him to the total amount of $1,131.76, but withheld the same unlawfully under the claim and pretense that the relator owes said sum to the United States. The petition also alleged due demand upon said Smith, as auditor, and his unlawful refusal to issue and deliver a warrant or pay check for the said sum.

The respondent Smith answered the petition for the writ of mandamus; admitted that he was the auditor for the Panama Canal and that the relator was the judge of the District Court of the Canal Zone; that the respondent withholds the said sum of $1,131.76 from the relator, but denied that he had withheld said sum unlawfully, and that the relator was entitled to the relief sought. The respondent justified his withholding of the said sum upon the ground that part of said sum was withheld to cover charges for house rent and electric current which the respondent alleged to be due the United States by the relator; that another part was withheld because the respondent, as auditor, had deducted same from the relator's salary as judge on account of the absence of the relator from the Canal Zone in excess of the annual six weeks' vacation allowed relator by law; and that another part was withheld in compliance with directions of the Comptroller of the Treasury.

The respondent insisted that he had the right to make the deductions from the salary of the relator; that the relator should file claim therefor with the auditor of the treasury and, in the event of adverse decision by him should appeal to the Comptroller of the Treasury, or, else file suit against the United States in the Court of Claims, and denied the authority of the court to issue a writ of mandamus as prayed against him.

Upon the trial of the cause on the merits by the court and without a jury

by agreement of the parties, the court decided that it was the legal duty of the respondent Smith, as auditor, to issue and deliver to the relator warrants or pay vouchers for the amounts of salary withheld; that his action in so withholding the said amounts from Judge Jackson's salary was without authority of law; that mandamus was the proper remedy to compel respondent to perform this ministerial duty, and, accordingly, issued the peremptory writ of mandamus as prayed. Whereupon respondent brought this writ of error.

The following is the opinion of HENRY D. CLAYTON, District Judge, Middle and Northern Districts of Alabama, presiding by designation of the President under Act Cong. Aug. 24, 1912 (37 Stat. 565, c. 390, § 8 [Comp. St. 1916, § 10044]):

Under the appointment by the President and confirmation by the Senate, William H. Jackson, the relator, duly qualified as District Judge of the Canal Zone on May 1, 1914, and has ever since continuously discharged the duties of his office. He became and is entitled to the same salary as that paid a District Judge of the United States. Section 8, act supra.

The relator avers "that the Congress of the United States has heretofore appropriated funds for the payment of the salary of your petitioner, and has appropriated funds for salaries and expenses necessary for the civil government of the Canal Zone, including the expenses of your petitioner herein while engaged in the performance of his official duties, and that the funds appropriated as aforesaid, are now available for the payment of said salary and expenses." And this allegation is admitted by the respondent in his answer to the petition.

H. A. A. Smith, the respondent, is the auditor of the accounting department of the Panama Canal, and is charged with the collection, custody, and disbursement of funds for the Panama Canal and the Canal Zone, including the funds appropriated by Congress for the relator's salary. The respondent has paid to the relator his salary monthly and from time to time, but now withholds from him of his salary the sum of $1,131.76 for the payment of the following items of alleged indebtedness to the Panama Canal, namely: From the salary due the relator for the month of December, 1914, $170.07, for rent of residence, house No. 118, Ancon, C. Z., from May 1 to October 17, 1914, 5 months and 17 days at the rate of $25 per month, and electric current for the same period at the rate of $5.55 per month; from the salary due the relator for the month of January, 1916, $66.66, on account of alleged absence for a period of 4 days during said month of January beyond the 6 weeks' leave referred to in the Panama Canal Act; from the salary due the relator for the month of March, 1916, $500, to apply on account of rent for use of residence No. 311, Ancon; from the salary due the relator for the month of April, 1916, $341.97, alleged balance due for rent of house No. 311, Ancon, to April 30, 1916, and account of 1 days' alleged absence beyond the 6 weeks' leave referred to in the Panama Canal Act; and from the salary due the relator for the month of May, 1916, $53.06, account of rent for house No. 311, Ancon, and electric current—or a total sum of $1,131.76.

The relator avers that he is not indebted to the Panama Canal or the United States in any sum or sums whatsoever, and denies specifically every item of the above-mentioned claim of indebtedness, and alleges that the before-mentioned sum of $1,131.76 of his salary is being unlawfully withheld from him by the respondent.

The prayer is that the respondent, the auditor of the Panama Canal, be compelled by peremptory mandamus to audit, approve, issue, and deliver to the relator warrants, vouchers, or pay checks for his salary as District Judge of the Canal Zone, as required by law and the practice, without regard to said claim of indebtedness set up by the respondent, which, as before stated, is denied by the relator.

The respondent admits the appointment and service of the relator as District Judge of the Canal Zone, but he claims that he has the right, and that it is his duty, to withhold the said sums described on the ground of the re-

lator's alleged indebtedness for house rent and electric lights, and the sums deducted and withheld on account of 5 days' alleged absence from the Canal Zone in excess of the 6 weeks' leave of absence specially provided for in section 8, Act of August 24, 1912.

[1] 1. This act is entitled "An act to provide for the opening, maintenance, protection, and operation of the Panama Canal, and the sanitation and government of the Canal Zone." It is sometimes referred to as the Panama Canal Act, but is commonly called the Adamson Act after its distinguished author.

It is provided in this act: "Section 2. That all laws, orders, regulations, and ordinances adopted and promulgated in the Canal Zone by order of the President for the government and sanitation of the Canal Zone and the construction of the Panama Canal are hereby ratified and confirmed as valid and binding until Congress shall otherwise provide. The existing Courts established in the Canal Zone by executive order are recognized and confirmed to continue in operation until the courts provided for in this act shall be established." Comp. St. 1916, § 10038.

And it is pertinent to quote the following section of the act: "Section 8. That there shall be in the Canal Zone one District Court with two divisions, one including Balboa and the other including Christobal; and one district judge of the said district, who shall hold his court in both divisions at such time as he may designate by order, at least once a month in each division. The rules of practice in such District Court shall be prescribed or amended by order of the President. The said District Court shall have original jurisdiction of all felony cases, of offenses arising under section ten of this act, all causes in equity; admiralty and all cases at law involving principal sums exceeding three hundred dollars and all appeals from judgments rendered in magistrates' courts. The jurisdiction in admiralty herein conferred upon the District Judge and the District Court shall be the same that is exercised by the United States District Judges and the United States District Courts, and the procedure and practice shall also be the same. The District Court or the judge thereof shall also have jurisdiction of all other matters and proceedings not herein provided for which are now within the jurisdiction of the Supreme Court of the Canal Zone, of the Circuit Court of the Canal Zone, the District Court of the Canal Zone, or the judges thereof. Said judge shall provide for the selection, summoning, serving, and compensation of jurors from among the citizens of the United States, to be subject to jury duty in either division of such district, and a jury shall be had in any criminal case or civil case at law originating in said court on the demand of either party. There shall be a district attorney and a marshal for said district. It shall be the duty of the district attorney to conduct all business, civil and criminal, for the government, and to advise the Governor of the Panama Canal on all legal questions touching the operation of the canal and the administration of civil affairs. It shall be the duty of the marshal to execute all process of the court, preserve order therein and do all things incident to the office of marshal. The District Judge, the district attorney, and the marshal shall be appointed by the President, by and with the advice and consent of the Senate, for terms of four years each, and until their successors are appointed and qualified, and during their terms of office shall reside within the Canal Zone, and shall hold no other office nor serve on any official board or commission nor receive any emoluments except their salaries. The District Judge shall receive the same salary paid the District Judges of the United States, and shall appoint the clerk of said court, and may appoint one assistant when necessary, who shall receive salaries to be fixed by the President. The District Judge shall be entitled to six weeks' leave of absence each year with pay. During his absence or during any period of disability or disqualification from sickness or otherwise to discharge his duties the same shall be temporarily performed by any Circuit or District Judge of the United States who may be designated by the President, and who, during such service, shall receive the additional mileage and per diem allowed by law to District Judges of the United States when holding court away from their homes. The

district attorney and the marshal shall be paid each a salary of five thousand dollars per annum."

By the reading of this section it is seen that the District Court of the Canal Zone has original jurisdiction in all cases at law involving principal sums exceeding $300, and that jurisdiction of all other matters and proceedings not specially provided for in the act were by the terms of the act itself retained in the District Court or the judge thereof, including jurisdiction of all matters and proceedings of which the Supreme Court, the Circuit Courts, and the District Courts of the Canal Zone had jurisdiction at the time the Adamson Act was passed. And it must be remembered that the Code of Civil Procedure of the Canal Zone was by the authorized order of the President, dated May 1, 1907, made a part of the law governing the Canal Zone; and this too, it will be observed, was continued in force by the Adamson Act. This Code provides as follows:

"Sec. 552. *Procedure in Mandamus.*—The Supreme Court shall have concurrent jurisdiction with the Circuit Courts in all cases where any inferior tribunal, corporation, board, or person unlawfully neglects the performance of an act which the law specially enjoins as a duty resulting from an office of trust or station, or unlawfully excludes the plaintiff from the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully excluded by such inferior tribunal, corporation, board, or person, and also shall have original jurisdiction over Circuit Courts and judges thereof wherever said court or judge unlawfully neglects the performance of a duty which the law specifically or specially enjoins as a duty imposed upon such court or judge. The procedure of the Supreme Court in mandamus proceedings shall be the same as those provided for mandate in this Code."

"Sec. 554. *Preliminary Injunctions in Certiorari, Mandate, Prohibition Proceedings.*—In certiorari, mandamus, and prohibition proceedings an injunction may be granted by any judge of the Supreme Court, if in his judgment such injunction is necessary for the preservation of the rights of the parties pending litigation."

"Sec. 555. *Expediting Such Proceedings.*—The court may, in its discretion, make such orders as it deems necessary for expediting proceedings in petitions for certiorari, mandamus, or prohibition proceedings."

Thus we find the District Court of the Canal Zone has jurisdiction in all cases where any inferior tribunal, corporation, board, or person unlawfully neglects the performance of an act which the law specifically enjoins as a duty resulting from an office or position of trust, or unlawfully denies to or excludes one entitled to the use and enjoyment of a right or office from the use or enjoyment of such right or office or any right which is unlawfully denied by an inferior tribunal, corporation, board, or person.

It was never heretofore contended that the former Circuit and Supreme Courts of the Canal Zone did not have authority to issue a writ of mandamus, or that the District Court as now constituted does not have such power. Manifestly Congress legislated, in passing the Adamson Act, with reference to the Code of Civil Procedure, supra, and presumably with knowledge of and reference to proceedings in the courts, Circuit and Supreme, of the Canal Zone. As now constituted, the jurisdiction and power of the District Court of the Canal Zone was not abridged by the Adamson Act, but, on the contrary, this court was invested by the act with all the powers heretofore exercised by the Circuit and Supreme Courts of the Canal Zone. As before said, it must be presumed that Congress knew the power and jurisdiction of such courts and the proceedings had in them, and, on admitted elementary principle, the act of Congress is to be considered in the light of what was done by and in the courts of the Canal Zone. Let me refer to some of the adjudged cases.

On page 134, vol. 1, of the published Reports of the Supreme Court of the Canal Zone, Canal Zone ex rel. Andrade v. Goolsby, Case No. 45, decided on September 19, 1908, the Supreme Court held that a writ of mandamus would lie, and in fact issued a writ of mandamus to E. M. Goolsby, clerk of the Circuit Court of the Second Judicial Circuit.

In Canal Zone ex rel. Seixas v. Gudger, 2 Canal Zone Supreme Court Re-

ports. p. 69, the Supreme Court of the Canal Zone refused to issue a writ of mandamus, not because it did not have jurisdiction so to do, but because the relator in that case sought by mandamus to compel the judge of the Second Circuit Court to grant an appeal when no bill of exceptions had been prepared and presented to him. The closing paragraph of that decision is as follows (loc. cit. 71): "Since, therefore, the petition herein fails to show that the relator made any proper attempt to perfect his bill of exceptions, and since it also fails to show that the respondent unlawfully neglected the performance of any duty specifically or specially enjoined upon him as acting judge of the Circuit Court for the Second Circuit, it is considered by the court that the alternative writ heretofore issued should be quashed, that the stay granted therein should be vacated, and the petition dismissed, with costs against the relator. It is so ordered."

In Canal Zone ex rel. Wm. H. Knox & Co. v. Goolsby, 2 Canal Zone Supreme Court Reports, 64, a peremptory writ of mandamus did issue to the respondent, commanding him to pay to the relator the sum of $4,434. The syllabus in this case is manifestly erroneous, as the body of the decision on page 65 shows that a writ of mandamus did issue.

In Canal Zone ex rel. Succari v. Owen, 2 Canal Zone Supreme Court Reports, 66, the Supreme Court refused a writ of mandamus, directing a judge of the Circuit Court to sign a bill of exceptions, when it appeared that the bill of exceptions was tendered solely for the purpose of saving an exception taken to a ruling of the court on May 23d, overruling a motion to vacate a judgment that had been rendered at the March term. The Supreme Court held that the Circuit Court had lost control over the judgment and was powerless to set aside at the May term of court a judgment rendered at the March term, and that therefore even though a bill of exceptions had been signed, it would not have benefited the party applying for the writ of mandamus. For this reason the writ was refused.

In the case of Kung Ching Chong v. Wing Chong, 2 Canal Zone S. C. Reports, p. 25, loc. cit. 29, the Supreme Court, in defining the jurisdiction of Circuit Courts in the Canal Zone, said as follows: "What is a Circuit Court of the Canal Zone? A court limited in its jurisdiction by the substantive law of Panama? Not so. They are courts of equal plenary jurisdiction with the Court of King's Bench in Great Britain and the circuit courts of the states of the Union and the United States. Courts of the highest jurisdiction in the world. Nothing jurisdictional is withheld from them. Over the life, the property, and liberty of the litigants before them they possess all jurisdictional power."

These cases are cited for the purpose of showing that never heretofore was the authority of the Circuit and Supreme Courts of the Canal Zone questioned, and further to show that as a matter of fact writs of mandamus have been issued by these courts.

As we have said the present District Court of the Canal Zone is vested with all the jurisdiction of the former Circuit and Supreme Courts of the Canal Zone which lawfully exercised the power to issue writs of mandamus.

It is clear that Judge Jackson is entitled to his salary of $6,000 per annum in monthly payments of $500 just as in case he were a District Judge of the United States. And it appears to be equally clear that the District Court of the Canal Zone has authority to issue a peremptory mandamus if a proper case is presented.

[2] 2. Let us now consider whether mandamus can be rightfully issued against the auditor of the Panama Canal. The Adamson Act provides as follows: "Sec. 4. That when in the judgment of the President the construction of the Panama Canal shall be sufficiently advanced toward completion to render the further services of the Isthmian Canal Commission unnecessary the President is authorized by executive order to discontinue the Isthmian Canal Commission, which, together with the present organization, shall then cease to exist; and the President is authorized thereafter to complete, govern, and operate the Panama Canal and govern the Canal Zone, or cause them to be completed, governed, and operated, through a Governor of the Panama Canal and such other persons as he may deem competent to discharge

the various duties connected with the completion, care, maintenance, sanitation, operation, government, and protection of the canal and Canal Zone. If any of the persons appointed or employed as aforesaid shall be persons in the military or naval service of the United States, the amount of the official salary paid to any such person shall be deducted from the amount of salary or compensation provided by or which shall be fixed under the terms of this act. The Governor of the Panama Canal shall be appointed by the President, by and with the advice and consent of the Senate, commissioned for a term of four years, and until his successor shall be appointed and qualified. He shall receive a salary of ten thousand dollars a year. All other persons necessary for the completion, care, management, maintenance, sanitation, government, operation, and protection of the Panama Canal and Canal Zone shall be appointed by the President, or by his authority, removable at his pleasure, and the compensation of such persons shall be fixed by the President, or by his authority, until such time as Congress may by law regulate the same, but salaries or compensation fixed hereunder by the President shall in no instance exceed by more than twenty five per centum the salary or compensation paid for the same or similar services to persons employed by the government in continental United States. That upon the completion of the Panama Canal the President shall cause the same to be officially and formally opened for use and operation." Comp. St. 1916, § 10040.

Thereafter, in pursuance to the provisions of section 4 above quoted, under date of January 27, 1914, the President promulgated an executive order, section 6 of which reads as follows:

"6. There shall be an accounting department under the supervision and direction of the auditor, with an assistant in the United States. The duties of the department shall include all general bookkeeping, auditing and accounting, both for money and property, cost keeping, the examination of pay rolls and vouchers, the inspection of time books and of money and property accounts, the preparation of statistical data, and the administrative examination of such accounts as are required to be submitted to the United States Treasury Department; and the collection, custody and disbursement of funds for the Panama Canal, and the Canal Zone."

"These same duties shall be performed for the Panama Railroad Company on the Isthmus when not inconsistent with the charter and by-laws of that company. The department shall be charged with the handling of claims for compensation on account of personal injuries and of claims for damages to vessels. Within the limits fixed by law, the duties and financial responsibilities of the officers and employés charged with the receipt, custody, disbursement, auditing and accounting for funds and property shall be prescribed in regulations issued by the Governor, with the approval of the President. The auditor shall maintain such a system of bookkeeping as will enable him to furnish at any time full, complete, and correct information in regard to the status of appropriations made by Congress, the status of all other funds, and the amounts of net profits on all operations, which are to be covered into the treasury as required by the Panama Canal Act."

The act conferred a very broad power upon the President. It authorized him to "complete, govern and operate the Panama Canal and govern the Canal Zone, or cause them to be completed, governed, and operated through a Governor of the Panama Canal and such other persons as he may deem competent to discharge the various duties connected with the completion, care, maintenance, sanitation, operation, government, and protection of the Canal and Canal Zone." Of course, such executive orders as the President promulgated for the purpose of putting said act into effect became a part of the act itself. Moreover, by its very terms the act did not become operative until the executive order put it into effect. It is plain, therefore, that these executive orders are to be interpreted and treated by this court as a part of the congressional enactment.

It will be observed that section 6 of the executive order, supra, provided that there should be an auditor, with an assistant in the United States. He was authorized to have charge of the collection, custody, and disbursement of funds for the Panama Canal and the Canal Zone, including all moneys ap-

propriated by Congress for the Panama Canal and the civil government, etc., of the Canal Zone. He was made at once the custodian, the auditor, and disburser of the funds to be expended on the Isthmus.

This executive order further provided that the auditor shall maintain such a system of bookkeeping as will enable him to furnish at any time full, complete, and correct information in regard to the status of appropriations made by Congress, and the status of all other funds and the amounts of net profits on all operations, which are to be covered into the treasury as required by the Panama Canal Act.

The last sentence of section 6 of the Panama Canal Act, to which this section of the executive order refers, is in this language: "Monthly reports of such receipts and expenditures shall be made to the President by the persons in charge, and annual reports shall be made to * * * Congress." Comp. St. 1916, § 10042.

Now, the person in charge of these funds was the auditor, which position or office was created by the President under the executive order above quoted. It is true that the auditor has an assistant in the United States, but he was no more than an assistant there. The auditor in the Canal Zone had charge of the funds and exclusive control over their disbursement. This is manifest from that portion of section 6 of the Panama Canal Act heretofore quoted; and it was necessary for him to make reports monthly to only one department or official, namely the President, and to make reports annually to only one body, namely Congress. The act of Congress and the executive orders thereunder placed the auditor of the Panama Canal under the President and the Congress of the United States, and under no other official, body, or department.

Again, section 5 of the executive order of March 2, 1914, in amplification of section 6 of the executive order above quoted, is in the following language: "Section 5. That the assistant auditor provided for in executive order No. 1885, dated January 27, 1914, shall be appointed April 1, 1914. His salary shall be fixed by the Governor. He shall perform such duties of the accounting department to be performed in the United States, as may be assigned to him by the auditor, and also such other duties of a general nature as may be assigned to him by the chief of the Washington office of the Panama Canal.

"On and after April 1, 1914, there shall be transferred to the assistant auditor, and he shall be charged with the custody, care and preservation, of all records and property of the disbursing officer, and of the assistant examiner of accounts of the Isthmian Canal Commission, with which those officers shall be charged on March 31, 1914.

"The chief of the Washington office may, however, transfer to and place in the custody of the disbursing clerk, hereinafter provided for, such of the property and records above described, as he may deem to be essential to enable the disbursing clerk to properly perform his duties under this order, but the disbursing clerk shall not be permitted, without specific authority from the chief of office, to keep a separate set of records and files. He shall be required to rely upon, and consult when necessary, the records and files in the office of the assistant auditor, in verifying the legality of claims and accounts submitted to him for payment, or to verify the details of any collection for which he is required to account. Disbursements will be made by the disbursing clerk only after examination of the claim or account in the office of the assistant auditor.

"Such of the officers and employés employed in the office of the assistant examiner of accounts and the disbursing office of the Isthmian Canal Commission on March 31, 1914, as the Governor determines to retain, shall be transferred to and employed in the accounting department in the United States, and their salaries fixed at such amounts as the Governor deems just and reasonable.

"There shall be a disbursing clerk for that part of the accounting department in the United States, who shall perform similar duties to those that are required to be performed by the collector and paymaster on the Isthmus, in so far as there are such duties to be performed in the United States, and shall be subject to the same supervision by the assistant auditor, as the col-

lector and paymaster on the Isthmus are by the auditor. He shall give bond in such amount as may be fixed by the Governor, or by his authority.

"Such of the officers and employés as are transferred to and employed in the accounting department in the United States, shall be distributed between the office of the assistant auditor and that of the disbursing clerk, respectively, as the needs of the service require. They shall perform such duties as may be assigned to them by proper authority. They shall be subject to similar financial responsibilities, and to the same general rules and regulations that have been prescribed for like officers and employés in the accounting department on the Isthmus.

"It is the purpose of this order, and it shall be so construed, as to require the assistant auditor of the Panama Canal to examine all claims and accounts before their payment by the disbursing clerk; to carry on all general correspondence in relation to claims and accounts required to be conducted by the accounting department in the United States; to prepare all vouchers and certify to the validity of all claims and accounts before they are submitted to the disbursing clerk for payment; to furnish to the disbursing clerk all necessary data to enable that officer to make reply to any exceptions that may be taken to his account by the auditor for the War Department; to keep all general records to be kept in the accounting department in the United States; to make all reports as to statistical data required to be sent to the auditor on the Isthmus; to give an administrative examination to all accounts of the disbursing clerk before they are transmitted to the auditor; to make an administrative examination of all claims which are to be submitted to the auditor for direct settlement; to keep a complete record of all collections to be made and all moneys received by the disbursing clerk; to certify to the correctness of the disbursing clerk's accounts for collections; to see that bills collectible are issued and collections made in all proper cases; to have charge of all general files which are required to be kept by the accounting department in the United States; and to perform such other duties as may be assigned to him by the auditor, or the chief of the Washington office."

The executive order of March 2d above quoted is as much the law as the act of Congress or the executive order of January 27th hereinbefore referred to. It is an enlargement or explanation of section 6 of the order of January 27th. It clearly defines the duties and functions of the assistant auditor and conclusively shows that such assistant in the United States is under the direction of the auditor on the Isthmus, who is the final auditor. And it will be observed this section last quoted states that the disbursing clerk under the assistant auditor in Washington shall be subject to the same supervision by the assistant auditor as the collector and paymaster on the Isthmus are by the auditor. It is plain that this section accentuates the fact that the assistant auditor at Washington is under the supervision of the auditor on the Isthmus, and this assistant is specifically directed to report to such auditor.

It seems that nothing further need be said to demonstrate that this auditor, the respondent in this case, is the final auditor. But he is more than an auditor because by the very provisions of the executive order creating his office he not only audits, but he orders the disbursement of all funds, for the language of the act charges him with the disbursement of the funds. It is a reasonable and consistent interpretation to say that the executive order shows that the disbursing clerks and paymasters under the assistant auditor in Washington and under the auditor on the Isthmus, the final auditor, are no more than pay clerks who are required to pay the vouchers as they have been audited by the assistant auditor in Washington, and by the auditor on the Isthmus who is vested with the power of disbursement.

It seems to be incontrovertible that the two provisions of the two executive orders above quoted, one putting the Canal Act into operation, and the other amplifying and explaining the terms of the first order, are as much a part of the Panama Canal Act itself as if these two sections had been embraced in the act. I think the conclusion necessarily follows that the respondent is the final auditor so far as Judge Jackson's salary is concerned.

And I think also that it is not to be doubted that the auditor, under the provisions of the Canal Act, needs only to report to the President, and to

Congress. It is not believed if it had been the intention of Congress that the final auditor should be in Washington, and that the auditor on the Isthmus should be under some other official, that the office of assistant auditor would have been created whereby the assistant at Washington is to act under the auditor on the Isthmus. It is entirely consistent to say that the Panama Canal maintains what may be termed a branch office at Washington with the assistant auditor there to audit the accounts of that branch office: and as a part of his duty under section 5 of the executive order of March 2, 1914, he is required to send data to the auditor on the Isthmus and to transmit the examination of accounts to the auditor on the Isthmus.

[3] Recurring to the duties of the auditor of the Panama Canal, it is to be borne in mind that under the Adamson Act and executive orders in pursuance thereof he is charged with "the collection, custody and disbursement of funds for the Panama Canal and the Canal Zone," as I have attempted to show. Section 4 of the Adamson Act, and section 6, Executive Order Jan. 27, 1914, supra. And in the so-called Sundry Civil Act of March 3, 1915, c. 75, 38 Stat. at L., 63d Cong. 3d S. 883, 884, the appropriation is made "for every expenditure requisite for and incident to the construction, maintenance and operation, sanitation, and civil government of the Panama Canal and Canal Zone, including the following: Compensation of all officials and employés * * * and for such other expenses not in the United States as * * * necessary to best promote the construction, maintenance, * * * operation, sanitation, and civil government of the Panama Canal, * * * as follows: * * * For civil government of the Panama Canal and Canal Zone, salaries of District Judge, $6,000, district attorney, $5,000, marshal, $5,000," etc.

It is seen that expenses not in the United States, including the civil government of the Panama Canal, embrace the specific sum of $6,000 appropriated by the act of Congress for the payment of the salary of the District Judge, up to June 30, 1916. It is my opinion that in legal contemplation this fund is on the Isthmus and is subject to disbursement there under the direct authority of the auditor of the Panama Canal, who must report with reference thereto to the President and to the Congress, and who is not otherwise required to report.

Under the law and the practice obtaining in the Canal Zone in such case it is the duty of the auditor to make and deliver the pay voucher to relator for his salary at the end of each month, and under the same law and practice it is the duty of the paymaster, who is no more than a paying teller of the respondent, to pay the salary upon the certificate or voucher of the auditor there. Nothing is left to the judgment or discretion of the auditor in the matter of such disbursement. He is required to perform a ministerial duty and no more.

[4] 3. In his answer the respondent says that he has sought the advice of the Comptroller of the Treasury under the following provision of the Dockery Act (R. S. Supp. vol. 2, 1892–1901, p. 216, Act July 31, 1894, c. 174, § 8, 28 Stat. 207): "Disbursing officers, or the head of any executive department, or other establishment not under any of the executive departments, may apply for and the Comptroller of the Treasury shall render his decision upon any question involving a payment to be made by them or under them."

And he insists that the Comptroller has rendered a decision against Judge Jackson that precludes any action by this court.

Now the only question involved in the payment of the judge's salary is the one raised by the respondent, who withholds $1,131.76 of the salary, where the services and identity of Judge Jackson are admitted. The pleadings in the case and the briefs submitted by counsel in behalf of the respondent, as well as the testimony and oral argument, show that the respondent did not submit to the Comptroller a question of payment to be made by him as auditor. But, rather, that he did submit to the Comptroller the question as to whether or not he as auditor had the right to retain portions of the relator's salary for the satisfaction of alleged indebtedness of relator to the United States or the Panama Canal.

The relator's salary does not fall under the category of a claim against the United States. It is fixed compensation earned by him and for which a

specific appropriation has been made and the manner of disbursement provided for. It requires no argument to show that the case at bar is different from one where a claim is made against the United States and judgment and discretion is vested in an accounting officer authorized by law to adjust and settle the claim. In such case as that the Comptroller of the Treasury shall upon application render his decision upon any question involving a payment to be made.

Here the salary was ascertained or fixed by law and the money for its payment appropriated by Congress, as before stated. In legal effect it was on the Canal Zone, or in the hands or under the control of the disbursing officer, who is the respondent here. There was nothing left to the judgment or discretion of the respondent whose duty it was to disburse the money appropriated for the salary. Being satisfied of the identity of Judge Jackson it was the plain duty of the respondent to issue his warrant for the salary.

The salary of a judge who has served and for whose compensation specific appropriation has been made is not such a claim that affords any field for the operation of the Dockery Act. We are not without a guiding precedent. In the case of Benedict v. U. S., 176 U. S. 357–360, 20 Sup. Ct. 458, 459 (44 L. Ed. 503), it was said: "The case in reality turns upon the meaning of the word 'salary,' as used in section 714 [Comp. St. 1916, § 1237]. The word 'salary' may be defined generally as a fixed annual or periodical payment for services, depending upon the time, and not upon the amount, of services rendered * * * as applied to District Judges in general, and indeed to every District Judge except the judge of the Eastern District of New York, it doubtless refers to the salary of $5,000 fixed by the act of February 24, 1891 [chapter 287, 26 Stat. 783]. Such salary is an annual stipend, payable in sickness as well as in health, for duties much more onerous in some districts than in others, and regardless of the fact whether such duties are performed by the judge in person, or by the judge of another district called in to take his place. It is a compensation which cannot be diminished during the continuance of the incumbent in office, and of which he cannot be deprived except by death, resignation, or impeachment." There the Supreme Court of the United States distinctly declared that a federal judge cannot be deprived of his salary in whole or in part except by death, resignation, or impeachment. Of course, the appointment and qualification of a territorial judge who did not act as such, but was removed from office by executive order, would not entitle him to a salary. That was the case in U. S. v. Guthrie, 17 How. 284, 302–304, 15 L. Ed. 102, which is hereinafter considered and differentiated from the present case.

If the judge can be deprived of a part of his salary for alleged indebtedness for house rent when such rental charge was fixed arbitrarily, that is to say, without his consent and without any authority of law, such charge could, by the same token or assumed authority, have been made $500 per month, and thus so adjusted as to absorb the entire salary of the judge. I do not think that such a conclusion would be more absurd than the contention of the respondent that how much of and for what purpose he can withhold the salary of the judge is a matter entirely in the judgment and discretion of the respondent; and that his action in such matter cannot be reviewed by a court. There cannot be such an autocrat.

Our government cannot be reduced to a bureaucracy. Chief Justice Marshall said that the government of the United States has been emphatically termed a government of laws and not of men; and it is emphatically the province and duty of the judicial department to say what the law is. Marbury y. Madison, 1 Cranch, loc. cit. 165, 177, 2 L. Ed. 60. And as pertinent here it may be added that the judicial department must be allowed to continue to adjudge in cases involving personal and property rights.

[5] It was asserted by counsel for respondent that the salary of the judge was a claim or demand against the United States, and that the amount alleged to be due by relator to the Panama Canal by way of house rent was a claim or demand against the relator, and that therefore the auditor acted within the provisions of that section of the Dockery Act above quoted in submitting this matter to the Comptroller. But as I have said, it was a disputed claim

merely because of the fact that the auditor, the respondent in this case, had made it so. It cannot be said that the salary of the judge constituted a claim disputed or otherwise prior to the time that the respondent in this case saw fit to so assume. Furthermore, the Dockery Act provides that the auditor may submit to the Comptroller of the Treasury a question involving a payment to be made by the auditor. This was no question of a payment to be made from government funds by the auditor to a party asserting a right to such funds. It is a question of the auditor retaining from a federal judge, whose salary had been provided for and appropriated by Congress, such amounts as he saw fit to withhold. The claim in dispute was not against the government; it was against the relator. The act does not provide, and clearly never contemplated, that the auditor should arrogate to himself the right to even consider that any amount by way of claim or otherwise could be deducted from the salary of a federal judge based upon an alleged claim asserted by officials of the government.

Under this Dockery Act, therefore, this alleged claim was improperly submitted to the Comptroller of the Treasury by the respondent. It seems to me that the Comptroller of the Treasury should have advised the auditor when he submitted the alleged claim that he, the Comptroller, had no authority to pass upon it. The law confers no such function upon the Comptroller nor upon the auditor. Consequently, the opinion of the Comptroller of the Treasury was extraofficial, was not required by law, and constituted purely a gratuitous act of the respondent in this case in furtherance of his endeavor to unlawfully withhold relator's salary from him. The contention of the counsel for respondent that this court is without jurisdiction to issue the writ of mandamus because the Comptroller of the Treasury had "judicially decided the question" is, I think, untenable.

[6] 4. I do not think that there is any merit in the respondent's contention that he performs his duty under administrative organization and not under statutory organization. When the Congress passed the Panama Canal Act of August 24, 1912, and authorized the President to put it into operation when he deemed it expedient, and further authorized him to create such offices as he deemed necessary to provide for the sanitation and civil government of the Canal Zone, when the President, acting under the express authority of Congress, by executive order of January 27, 1914, created an accounting department under the supervision and direction of the auditor, who is the respondent; and when Congress later, in March 1915, appropriated money to pay this relator's salary of $6,000 per annum to June 30, 1916, and provided that it be paid on the Isthmus, it thereby became the duty of this auditor, created in pursuance of the statute, to audit and pay the salary as Congress had directed in the Adamson Act and the Sundry Civil Appropriation Act of March 3, 1915.

It is not to be doubted that the executive orders of January 27 and March 2, 1914, are in legal contemplation integral parts of the Panama Canal Act itself, and these and the appropriation act of March 1915, appropriating the funds to pay the relator's salary on the Isthmus, are binding law, compelling upon the respondent. In legal appreciation the respondent's office was created by statute; that is, by order in pursuance of a statute, which has all the effect of a statute, and that thereby his duties are clearly defined.

[7] 5. The respondent contends that the auditor of the War Department is the proper party against whom this relator should proceed, and predicates his contention upon this provision of Act Cong. October 22, 1913, c. 32, 38 Stat. 209: "The money accounts of the Panama Canal, under the Panama Canal Act of August 24, 1912 (Stat. at L., vol. 37, p. 560), shall continue to be audited by the auditor for the War Department." It must be conceded that this statement is general and that, on the other hand, specific authority is given by the executive order of the President of the United States to the auditor on the Isthmus both to audit and disburse all funds appropriated by Congress in connection with the Panama Canal.

I do not think that there is necessarily any conflict between the provision last above quoted and the executive orders promulgated under the Adamson Act. It is clear that prior to October 22, 1913, the auditor of the War De-

partment had never audited the salary of the District Judge for the simple reason that the office of District Judge was not created until the Panama Canal Act was put in force and effect by the executive order of the President in 1914. The office was created on April 1, 1914, and the present incumbent was confirmed by the Senate and received his commission as District Judge on May 1, 1914. Consequently, whatever other accounts the auditor for the War Department may have audited prior to October 22, 1913, he could not have audited the salary of the District Judge of the Canal Zone, there then being no District Judge, and therefore no salary of such officer to audit. The quotation from the act of October 22, 1913, states that the money accounts of the Panama Canal shall continue to be audited by the auditor for the War Department. The salary of this relator is a new account which never existed, and consequently did not need to be audited until after the promulgation of the executive orders of January 27, and March 2, 1914, creating the accounting department on the Isthmus, making the respondent in this case the final auditor, and defining the duties of certain of his subordinates both on the Canal Zone and at Washington. I find no law making it incumbent upon the auditor of the War Department to audit the salary of this relator, and there is nothing to show that, in the absence of statutory authority, his official had any authority to pass upon or to audit such salary.

And, again, when the Sundry Civil Appropriation Bill of March 3, 1915, providing for the payment of the salary of the relator, and appropriating the amount thereof, and directing its payment, was passed, the fund for the payment of the judge's salary was placed under the control of the auditor on the Isthmus. Congress knew, when this act making the appropriation for the judge's salary was passed, that in January and in March, 1914, the President had created the office of auditor on the Isthmian Canal, with an assistant at Washington, and that this law and the executive orders in pursuance thereof specifically defined the power and authority that was vested in the auditor on the Isthmus and in his assistant at Washington. Furthermore, when Congress made this appropriation for the payment of the salary of the District Judge it was done almost two years after the act of October 22, 1913. If the latter act could ever have had the meaning attributed to it by the respondent, the subsequent act of Congress, enacted presumably with the knowledge and approval of the two executive orders referred to, destroys the force of the provisions of the act of October 22, 1913, as insisted upon by the respondent. It follows that when Congress in March, 1915, appropriated the amount of relator's salary that had been previously fixed by the Adamson Act of August 24, 1912, Congress knew the provisions of the act of October 22, 1913, and also knew, in making the appropriation for relator's salary, it would be paid pursuant to the executive orders hereinbefore set forth.

It is familiar law that repeal by implication is not favored, and it is a recognized canon that where two acts are in apparent conflict, they must be so construed, if possible, as that they shall consist or harmonize with each other. And as a corollary the rule is that when two legislative provisions are in seeming conflict, the one being vague and general, and the other clear and specific, the latter will control, and, further, that if separate fields can be found for the operation of the two seemingly conflicting provisions, then, in such way, must the apparent hostility between the two provisions be reconciled and each allowed to operate in its own particular field.

6. The respondent contends that this relator should seek a mandamus against the auditor for the War Department at Washington. Were he to do so it seems to me such auditor would answer that the Adamson Act and the executive orders of January and March, 1914, and the appropriation Act of March, 1915, placing the funds for the payment of the relator's salary under the control of this respondent, would preclude this relator from having any remedy against him. I believe that such contention would be fatal to relator's case there.

The respondent further suggests that Judge Jackson can resort to the Court of Claims for the vindication of his rights. That court passes upon disputed claims, and whenever a judgment is rendered there it is the duty of Congress to appropriate money for its payment. Probably that tribunal would

hold that demand for the payment of Judge Jackson's salary could not be a claim triable there; that it is not a claim but is compensation fixed by law, for which payment is provided for by an existing appropriation. Benedict v. U. S., supra.

[3] 7. The rules of law governing mandamus against a public officer are well settled. The difficulty is making the proper application of the law in a particular case. Where a plain ministerial duty is imposed upon an executive officer—such a duty as leaves nothing to be determined according to his judgment and discretion—and he refuses to act under such circumstances, mandamus is appropriate to compel him to perform his duty. This is, of course, a principle universally recognized.

I think the misunderstanding in this case is attributable to a misconception of the law. Some time a too free use of cyclopedias and digests is resorted to, and too little real study is devoted to adjudged cases cited. It must be understood that no stricture is intended upon the counsel who made the oral argument for the respondent, for he, the district attorney, presented his own well-prepared brief and has demeaned himself altogether as a thoughtful and competent lawyer.

The numerous cases cited in the briefs for the respondent may be divided into two classes:

(1) Cases where the Supreme Court held that executive officers could not be compelled by mandamus to act in matters which had been left to their judgment or discretion. Illustrative of this principle is U. S. v. Lamont, 155 U. S. 303–307, 15 Sup. Ct. 97, 98 (39 L. Ed. 160), where Mr. Justice White, now the Chief Justice, in the opinion of the court, said: "Much was said in argument at bar upon the question of when a contract is to be regarded as completed under the circumstances here presented, and the discussion concerning the authority of the Secretary of War to review the action of an officer of engineers in such a case, and to direct a new adjudication, has taken a wide range. We deem the consideration of both these points unnecessary in view of the relator's bids under the second advertisement and specifications, and his contract to do the work at a less price and under new conditions. It is elementary law that mandamus will only lie to enforce a ministerial duty, as contradistinguished from a duty which is merely discretionary. This doctrine was clearly and fully set forth by Chief Justice Marshall in Marbury v. Madison, 5 U. S. (1 Cranch) 137, 2 [L. Ed.] 60, and has since been many times reasserted by this court. See Kendall v. Stokes, 44 U. S. (3 How.) 87, 11 [L. Ed.] 506; Brashear v. Mason, 47 U. S. (6 How.) 92, 12 [L. Ed.] 357; Reeside v. Walker, 52 U. S. (11 How.) 272, 13 [L. Ed.] 693; Holloway v. Whiteley, 71 U. S. (4 Wall.) 522, 18 [L. Ed.] 335; United States v. Seamen, 58 U. S. (17 How.) 225, 231, 15 [L. Ed.] 226, 228; United States v. Guthrie, 58 U. S. (17 How.) 284, 15 [L. Ed.] 102; United States v. Edmunds, 72 U. S. (5 Wall.) 563, 18 [L. Ed.] 602; Gaines v. Thompson, 74 U. S. (7 Wall.) 347, 19 [L. Ed.] 62; Cox v. United States, 76 U. S. (9 Wall.) 298, 19 [L. Ed.] 579; United States v. Schurz, 102 U. S. 378, 26 [L. Ed.] 167; Butterworth v. United States, 112 U. S. 50 [5 Sup. Ct. 25], 28 [L. Ed.] 656; United States v. Black, 128 U. S. 40 [9 Sup. Ct. 12], 32 [L. Ed.] 354; Brownsville Taxing Dist. v. Loague, 129 U. S. 493 [9 Sup. Ct. 327], 32 [L. Ed.] 780; Noble v. Union River Logging R. Co., 147 U. S. 165 [13 Sup. Ct. 271], 37 [L. Ed.] 123. The duty to be enforced by mandamus must not only be merely ministerial, but it must be a duty which exists at the time when the application for the mandamus is made. Thus in the case of Ex parte Rowland, 104 U. S. 604, 26 [L. Ed.] 861, this court, speaking through Mr. Chief Justice Waite, said: 'It is settled that more cannot be required of a public officer by mandamus than the law has made it his duty to do. The object of the writ is to enforce the performance of an existing duty, not to create a new one.' Moreover, the obligation must be both peremptory, and plainly defined. The law must not only authorize the act (Kentucky v. Boutwell, 80 U. S. [13 Wall.] 526, 20 [L. Ed.] 631), but it must require the act to be done. 'A mandamus will not lie against the Secretary of the Treasury unless the laws require him to do what he is asked in the petition to be made to do' (Reeside v. Walker, 52 U. S. [11 How.] 272, 13 [L. Ed.] 693; see, also, Cox v. United States, 76 U. S. [9 Wall.] 298, 19 [L. Ed.] 579), and the duty

must be 'clear and indisputable' (Knox County Comrs. v. Aspinwall, 65 U. S. [24 How.] 376 [16 L. Ed. 735])."

And (2) cases where plain ministerial duty was enjoined upon executive officers and mandamus was used to compel its performance. Illustrative of this principle is Roberts v. U. S. ex rel. Valentine, 176 U. S. 221, 20 Sup. Ct. 376, 44 L. Ed. 443, where Mr. Justice Peckham for the court, said: "The writ was refused in the Black Case [123 U. S. 40, 9 Sup. Ct. 12, 32 L. Ed. 354], because, as the court held, the decision which was demanded from the Commissioner of Pensions required of him, in the performance of his regular duties as Commissioner, the examination of several acts of Congress, their construction and the effect which the latter acts had upon the former, all of which required the exercise of judgment to such an extent as to take his decision out of the category of a mere ministerial act. A decision upon such facts, the court said, would not be controlled by mandamus. The circumstances under which a party has the right to the writ are examined in the course of the opinion, which was delivered by Mr. Justice Bradley; and many cases upon the subject are therein cited, and the result of the examination was as just stated. In this case the facts are quite different. There is but one act of Congress to be examined, and it is specially directed to the Treasurer. We think its construction is quite plain and unmistakable. It directs the Treasurer to pay the interest on the certificates which had been redeemed by him, and the only question for him to determine was whether these certificates had been redeemed within that meaning of that act. That they were we have already attempted to show, and the duty of the Treasurer seems to us to be at once plain, imperative, and entirely ministerial, and he should have paid the interest as directed in the statute. This case comes within the exception stated in the Black Case that, where a special statute imposes a mere ministerial duty upon an executive officer, which he neglects or refuses to perform, then mandamus lies to compel its performance, but the court will not interfere with executive officers of the government in the exercise of their ordinary official duties, even when those duties require an interpretation of the law; the court having no appellate power for that purpose. On this last ground the court denied the writ. Unless the writ of mandamus is to become practically valueless, and is to be refused even where a public officer is commanded to do a particular act by virtue of a particular statute, this writ should be granted. Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him, and therefore it was not ministerial, and the court would, on that account, be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter how plain its language, nor how plainly they violated their duty in refusing to perform the act required. In this case we think the proper construction of the statute was clear, and the duty of the Treasurer to pay the money to the relator was ministerial in its nature, and should have been performed by him upon demand. The judgment of the Court of Appeals must be affirmed."

[9] The respondent cites a number of cases to sustain his assertion that mandamus will not lie in this case. He contends that this is an action against the auditor in such official capacity as he may have, and is in effect an

action against the United States, and cites United States v. Guthrie, Secretary of the Treasury, 17 How. 284, 302, 304, 15 L. Ed. 102. Of course that case has been many times cited with approval by the Supreme Court of the United States. The principle was correctly applied there to the facts, but the case cannot be a precedent here to support the respondent's contention. There the relator Goodrich, on March 19, 1849, was duly commissioned Chief Justice of the Supreme Court of the territory of Minnesota at a compensation of $1,800 a year, payable quarterly. The tenure of his office was four years. After having received his lawful compensation for the time he had served the relator was informed on October 22, 1851, by the Acting Secretary of State that the President had removed him from office and had appointed in his place Jerome Fuller. After the four years from the date of his commission had expired the relator preferred a claim before the First Auditor of the Treasury for the sum of $2,343.00 as compensation for the period that had elapsed from the date that he was removed from office to the termination of the four-year period. The claim was rejected for the reason that there was no appropriation to pay his salary, and that the amount of the salary had been paid to Fuller, who had fulfilled the duties of the office, and that the auditor and Comptroller were bound to consider the removal of the relator and appointment of Fuller as legal and continuing. The Supreme Court affirmed the ruling of the Circuit Court in dismissing the application for the writ of mandamus upon the grounds that there is no power in the Circuit Court or in the Supreme Court to command the withdrawal of moneys from the United States Treasury to be applied in satisfaction of disputed claims against the United States; that no appropriation had ever been made to pay the salary of the relator, but that the appropriation had been made to pay the salary of the subsequent appointee of the President, who filled the office from which the relator had been removed; and that the acts of the auditor, the Comptroller and the Secretary of the Treasury in passing upon the claim were discretionary and quasi judicial; and that they were not merely ministerial; and that, therefore the court had no power to mandamus these officials. The principle announced as governing that decision has no application to the case at bar for the two cases are so different in essential particulars. A statement of these differences and further comment seem to be unnecessary. It is hardly necessary to add that the proceeding here is not an action against the United States, but is an action to compel an official of the United States to do his plain ministerial duty under the laws of the United States.

The respondent cites U. S. v. Lynch, 137 U. S. 280, 11 Sup. Ct. 114, 34 L. Ed. 700. In that case the relator was ordered in March, 1872, by his superior officer to proceed from Philadelphia to New York and thence by Pacific Mail to Colon, cross the Isthmus of Panama, and thence to Mare Island, Cal., and report for duty on board of the U. S. S. Lackawanna. Relator was a naval officer. He traveled 88 miles overland from Philadelphia to New York and some thousands of miles outside of the United States. He claimed that he was entitled to be paid 10 cents a mile for the full number of miles traveled. The respondent, the Fourth Auditor and the Second Comptroller of the Treasury answered that the relator had been paid 10 cents a mile for the total number of miles traveled in the United States, and his traveling expenses while traveling outside of the United States. It was found that for a number of years the Navy and Treasury Departments had, with but a single exception, held that the 10 cents a mile did not apply to travel to, from, or in foreign countries, but only to travel in the United States. This had long been the interpretation of the statute by the auditor and the comptroller. The relator sought to compel these officials by mandamus to interpret the statute differently from the way they had theretofore construed it—to compel them not only to exercise a discretionary or quasi judicial act, but to exercise it in his favor. There the relator had at most a claim against the United States for money expended by him. No act had appropriated any money for him that was available and withheld by the respondents. The Court of Claims was the proper forum in which the relator in that case should have sought vindication for his claim if he had any proper claim.

The case of Reeside v. Walker, 11 How. 290, 13 L. Ed. 693, is relied on by the respondent. There Reeside had certain post office contracts with the government of the United States. Alleging that he had been overpaid thereon, suit against him was brought in the Circuit Court of the United States for the Southern District of Pennsylvania, for the recovery of the sum of $32,709.62, the amount alleged to have been overpaid. Defendant filed a general demurrer and a counterclaim, and on trial being had a verdict was returned, finding that the plaintiff was indebted to the defendant for $188,496.06. On May 12, 1842, the transcript of the record bore the following entry: "Motion for new trial overruled; new trial refused and judgment on the verdict, copy of assignment, etc., filed." Later the executrix of defendant sought to compel the Secretary of the Treasury, by mandamus, to enter on the books of the Treasury Department to the credit of the deceased the sum of $188,496.06, and to pay the same to the relator as executrix of the deceased. The Supreme Court refused to grant the writ for the reasons that from the record no judgment appeared to have been given for the amount of the verdict; that relator failed to show the entry of a judgment; and that the verdict of the jury merely laid the foundation for a scire facias to issue and a hearing to be had on that if desired. The court said that: "The petitioner and her husband have neglected to pursue the case in that way to the final judgment, and hence have offered no evidence of one, of the verdict of indebtedness to Reeside by the United States." On these two points the court acted, and the rest of the case is merely obiter dicta. It was further stated, however, that there was no appropriation of Congress to pay the claim, and that it was "a well-known constitutional provision that no money can be taken or drawn from the public treasury except upon an appropriation by Congress.

The respondent refers to the United States v. Real Estate Savings Bank, 104 U. S. 733, 26 L. Ed. 908, as a supporting authority. That case was an appeal from the Court of Claims. The bank had paid certain taxes and afterwards discovered that $972.69 was wrongfully exacted and paid. It then sought the refund of that amount. The Commissioner of Internal Revenue and the Secretary of the Treasury approved the payment of the claim, and the Commissioner certified its allowance. Payment was refused by the officers of the treasury. The Court of Claims decided in favor of claimant and against the United States, and the Supreme Court sustained this ruling. There is nothing more to that case.

United States v. Kaufman, 96 U. S. 567, 24 L. Ed. 792, is cited by the respondent as an authority. That was an appeal from the Court of Claims, which had held that it had jurisdiction of a suit to recover an excess amount paid by way of special tax, and that an allowance of the claim by the Commissioner of Internal Revenue was sufficient, and that the court did not need to go behind the allowance and find the facts in respect to the original claim. The Supreme Court of the United States sustained that decision.

It will be noted that although the four cases above cited laid down general principles of law which are well recognized, they have absolutely no analogy to the case now under consideration.

Buchanan v. Alexander, 4 How. 20, 11 L. Ed. 857, is cited by the respondent to sustain the proposition that money in the hands of a disbursing officer is money in the treasury of the United States and cannot be reached by attachment or other process. In that case seamen of the frigate Constitution were indebted to boarding house keepers in Norfolk, Va. They sought to attach the wages of these seamen in the hands of the purser of the vessel. The Supreme Court held that the money was not subject to attachment. In the case at bar no one corresponds to the boarding house keeper, no one to the seamen, and no one to the purser, and no writ of attachment is sought.

The respondent contends that the principle recognized in Mississippi v. First Comptroller of the Treasury, Durham, 4 Mackey (D. C.) 235, is applicable here. I am unable to examine this case, as the report in which it is published is not to be had on the Zone. The respondent gives in his brief the following purported excerpt from the opinion: "That a court must not permit the United States to be sued by a mandamus directed to one of its officers where it could not be sued directly unless by its own consent under some spe-

cial statute allowing it. Now it does not require argument to manifest that a refusal by an officer of the Treasury Department, whose general duty under the law is to allow and take steps to issue a warrant for the payment of any claim, is a refusal of the claim by the United States for the time being; that a mandamus against him to compel the allowance and payment thereof, is a suit against the United States, and that it is none the less a suit against the United States because the ground or notices of refusal to allow may be obviously and notoriously without legal justification. In other words, that no error of judgment or capriciousness of conduct can destroy, for the time being, the quality of agent and actor in the name and on behalf of the government of the proper treasury official in disallowing the claim of any state or individual for money due or alleged to be owing by the United States."

I fail to see what bearing that decision has upon the instant case, for Judge Jackson's salary is not a claim, and there is no dispute in respect to the payment of the same except that which arises from the denial of the authority of the auditor to withhold a part of the ascertained and fixed salary. I have dealt with this phase of the case in another part of this opinion.

Louisiana v. McAdoo, 234 U. S. 627, 34 Sup. Ct. 938, 58 L. Ed. 1506, is cited by the respondent. In that case the state of Louisiana, through its Attorney General, sought to obtain permission to file a petition against the Secretary of the Treasury and the Assistant Secretary of the Treasury in order to review their official judgment as to the rate of duty to be exacted under various tariff acts. In that case the court said that if the state of Louisiana, as a producer of sugar, could review the action of the Secretary of the Treasury in determining the rate to be collected on Cuban sugar, any consumer, though not an importer, might make a similar complaint if in his judgment the Secretary of the Treasury exacted a higher rate than justified by the law, thereby enhancing the price he must pay in the market upon the imported articles which he used. The court held that it was an attempt to review the official action of the Secretary of the Treasury in the exercise of his judgment as to the rate which should be demanded under his construction of the tariff act, and that such suits would operate to disturb the whole revenue system of the government, and effect the revenues which arise therefrom. Furthermore, it was stated that such a suit would obviously be one against the United States as such.

The respondent cites United States ex rel. Goldberg v. Daniels, 231 U. S. 218, 34 Sup. Ct. 84, 58 L. Ed. 191. That was a petition for mandamus, praying that the Secretary of the Navy be directed to deliver the United States cruiser Boston to the petitioner. It was asserted hat the petitioner had bid more than the appraised value of the ship, which, after survey, condemnation and appraisal, had been stricken from the naval registry under the act of August 5, 1882, c. 391, 22 Stat. 296, and proposals for the purchase of which the Secretary of the Navy had advertised. After the petitioner sent his certified check to the Secretary of the Navy, the Secretary refused to deliver the vessel and returned the check. The answer admitted the fact, and set up that the bid was not the acceptance of an offer, but was only an offer in itself subject to be accepted or not, at the discretion of the Secretary, and that the Secretary never accepted the petitioner's bid, the government having decided to lend a cruiser to the Governor of Oregon for use by the naval militia of that state. The petition was refused by the court below on the ground that the discretion of the Secretary was not ended by the receipt and opening of the bids, even though they satisfied all the conditions prescribed. This judgment was affirmed.

In Ness v. Fisher, 223 U. S. 683, 32 Sup. Ct. 356, 56 L. Ed. 610, referred to by respondent, the Secretary of the Interior refused to accept, as conforming to the Timber and Stone Act of June 3, 1878, c. 151, 20 Stat. 89, an application to purchase under that act 160 acres of public land in the Roseberg Oregon Land District. The relator sought to compel the Secretary of the Interior to accept his application. It had been refused by the Secretary of the Interior, who ruled that the application was objectionable, in that it was made upon information and belief and not upon personal knowledge; that it was in fact for cultivation and valuable chiefly for its timber, and

that it was uninhabited and contained no mining or other improvements. The court said that it was confronted with the question, not whether the decision of the Secretary was right or wrong, but whether a decision of that officer, made in the discharge of a duty imposed by law and involving the exercise of judgment and discretion, could be reviewed by mandamus and he be compelled to retract it and to give effect to another finding, not his own and not having his approval. Manifestly the Court of Appeals was right in its refusal to issue the writ of mandamus, and the Supreme Court sustained the ruling.

In Champion Lumber Co. v. Fisher, 227 U. S. 445, 33 Sup. Ct. 329, 57 L. Ed. 591, on the respondent's brief, the petitioner sought to compel the Secretary of. the Interior and the Commissioner of the General Land Office, by writ of mandamus, to issue a patent for lands. It seems that the Commissioner and the Secretary of the Interior were advised by an agent, whom they had appointed to investigate, that flagrant fraud had been committed, and they were requested to withhold patents to the lands. Thereupon the Commissioner directed the registrar and receiver, Jackson, to suspend action on commutations and proofs until further investigation. It was further shown by the report of another special agent that the entry had been made for speculative purposes, with no attempt to comply with the requirements of the law, and the recommendation was made that the entry be canceled on the ground of nonremedy, noncultivation, nonimprovement, and abandonment. The Commissioner directed that a hearing be had. Petitioner moved for a stay of proceedings, and claimed that his entry should be patented without further proceedings. The motion was denied by the Commissioner, and this denial overruled by the Secretary of the Interior, who later denied a motion to review his decision, finding that a protest had been filed against the patent within two years from the issuance of the receiver's receipt, and holding that the case should proceed to hearing on the special agent's charge. The petitioner then sought relief in the court, praying that the Commissioner and the Secretary of the Interior be directed by mandamus to issue the patent as heretofore stated. The court held 'that this was an attempt to coerce the Secretary of the Interior in the exercise of his lawful discretion and judgment. It was said: "The case was therefore submitted and decided upon the issue whether the action of the Secretary was justified in the exercise of his lawful discretion because of the facts disclosed in the record." The petitioner did not challenge, nor did the court pass upon, the validity of an authority exercised, nor was the existence or extent of the authority or duty of an officer of the United States drawn in question in the sense in which it is used in the statute, the Dockery Act. This case was ultimately decided on the ground of jurisdiction; that the petition for the writ of error should be denied. The Supreme Court held that the case was not one that was appealable to that court under the fifth clause, section 250, of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1159 [Comp. St. 1916, § 1227]) and, by way of obiter, that the action of the Secretary of the Interior was wholly discretionary, and therefore not subject to review by mandamus.

In Oregon v. Hitchcock, 202 U. S. 60, 26 Sup. Ct. 568, 50 L. Ed. 935, cited by respondent, the Supreme Court held that the immunity of the United States from suit prevented a state from maintaining in the Supreme Court of the United States a suit against the Secretary of the Interior and the Commissioner of the General Land Office to restrain them from allotting and patenting in severalty swamp lands within the limit of an Indian reservation. The court further said that it could not interfere with the allotment and patenting by the Land Department of swamp lands within the limits of an Indian reservation while the legal title was still in the federal government. In that case the court stated: "Now, the legal title to these lands is in the United States. The officers named as defendants have no interest in the lands or the proceeds thereof. The United States is proposing to sell them. This suit seeks to restrain the United States from such sale, to divest the government of its title and vest it in the state. The United States is therefore the real party affected by the judgment, and against which, in fact, it will operate, and the officers have no pecuniary interest in the matter. If whether a suit is one against the state is to be determined, not by the fact of the party named as defendant

on the record, but by the result of the judgment or decree which may be entered, the same rule must apply to the United States. The question whether the United States is a party to a controversy is not determined by the merely nominal party on the record, but by the question of the effect of the judgment or decree which can be entered." The case was decided against the relator on the ground that the court had no jurisdiction, as it was manifestly a suit directly against the United States to seek to restrain it from selling lands that belonged to it, that the court would not interfere with the Land Department in its administration, and that until the legal title to lands passes from the government, inquiry as to equitable rights comes within the cognizance of the Land Department. The court stated that it could not anticipate the action of the Land Department, or take upon itself the administration of the land grants of the United States.

Again the respondent says that: "The courts will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law. Dunlap v. Black, Commissioner of Pensions, 128 U. S. 40 [9 Sup. Ct. 12, 32 L. Ed. 354]." In that case the Commissioner of Pensions adopted an interpretation of the law adverse to relator by refusing a pension certificate, and his decision was confirmed by the Secretary of the Interior. The court stated that it had no right to review such decision. It declined to interfere by mandamus with the executive orders of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, but held that when executive officers refuse to act in a case at all, or when by special statute or otherwise, a mere ministerial duty is imposed upon them, which they were bound to perform without further question, then, if they have refused to act, a mandamus might be issued to compel them. In that case the Commissioner of Pensions and the Secretary of the Interior acted in the discharge of a quasi judicial function. This paragraph from the opinion of the court is sufficient to show that it has no bearing in this case: "Judged by this rule, the present case presents no difficulty. The Commissioner of Pensions did not refuse to act or decide. He did act and decide. He adopted an interpretation of the law adverse to the relator, and his decision was confirmed by the Secretary of the Interior, as evidenced by his signature of the certificate. Whether if the law were properly before us for consideration, we should be of the same opinion, or of a different opinion, is of no consequence in the decision of this case. We have no appellate power over the Commissioner, and no right to review his decision. That decision and his action taken thereon were made and done in the exercise of his official functions. They were by no means merely ministerial acts."

The respondent cites the case of Schillinger et al. v. United States, 155 U. S. 163, 15 Sup. Ct. 85, 39 L. Ed. 108. That was an appeal from a judgment of the Court of Claims, dismissing a suit brought by plaintiff against the United States to recover damages for the wrongful use of a patent for improvement in concrete pavement. It was nothing more nor less than an action in tort against the United States. The Supreme Court held that the Court of Claims was correct in deciding that it had no jurisdiction of a tort action against the United States, and that without its consent the United States could not be sued.

[10] 8. The respondent insists that the relator is indebted to the United States or the Canal Zone as hereinbefore stated. Is this true? Whether it is or not, the relator denies such indebtedness, and his case is justiciable and cannot be determined by a mere ministerial officer who has undertaken to decide without the intervention of a court or a judge and jury. It seems rather incongruous, to say the least of it, that this auditor should deny his authority and duty to pay the relator his salary and in the next breath assert that he has the authority and the discretion to withhold from the relator $1,131.76 of his salary for the alleged but denied indebtedness.

It is indisputable that the relator does not owe for house rent or electric lights unless there was some law or some executive order in pursuance of an act of Congress which imposed the duty to pay or authorized the collection charges for rent and lights. As a matter of fact there was never any congres-

sional legislation or any ordinance of the Isthmian Canal Commission, or executive order of the President, or any regulation of the Governor of the Panama Canal, providing for the collection of rent or electric light charges for the occupation of government quarters and lighting the same in the Canal Zone until the promulgation of the executive order of the President of the United States under date of February 2, 1914. Section 17 of this order is as follows: "Where practicable, such bachelor quarters on the Isthmus as may be available from time to time, will be assigned to all employés desiring them. Family quarters when available, will be assigned under such rules as may be prescribed by the Governor, and charges will be made for rent, fuel and electric current, at such times and in accordance with such regulations as the President may hereafter establish." In pursuance of this provision of the executive order, the President promulgates, on January 15, 1915, another executive order in this language:

"By virtue of the authority vested in me it is hereby ordered:

"1. Pursuant to the provision contained in paragraph 17 of the Executive Order of February 2d, 1914, fixing the conditions of employment governing employés of the Panama Canal and the Panama Railroad Company on the Isthmus of Panama, a charge will be made for rent, fuel and electric current on and after March 1st, 1915.

"Rent—2. The rental will be based on a percentage of the value of the quarters occupied, the rate per centum to be the same for all quarters, and the value of the quarters to be appraised by the Governor of the Panama Canal. The amount to be collected should be sufficient to defray the cost of maintenance of the quarters and grounds, maintenance and renewal of furniture, collection and disposal of garbage, and for bachelor quarters janitor service. No charge will be made for water.

"Fuel 3. Fuel will be sold to employés at cost delivered at quarters.

"Electric Current 4. The charge for electric current will be based on the cost of the current delivered to the quarters. When practicable the current used will be measured by meters; otherwise a charge will be made for each lamp or other device installed.

"5. Where employés for the good of the service are required to live in certain designated quarters, one-half of the rental will be remitted.

"6. When an officer of the army or navy is detailed for duty with the Panama Canal, and the amount of extra compensation of the position he occupies over and above his official salary as an officer of the army or navy is not sufficient to cover his rent, he will not be charged for rent, but will receive no extra compensation.

"7. The Governor of the Panama Canal is charged with the duty of issuing such instructions as may be necessary to carry out this order and to fix and change from time to time if necessary the rates and charges herein outlined subject to the general instructions provided.

"8. The free use of quarters, free fuel and free electric current are not, under the conditions of employment now governing, a vested or contract right of employés but revocable privileges, which it has been considered advisable to continue until the permanent force was organized. The revocation of these privileges shall not be made the basis for increasing salaries or wages or otherwise increasing compensation."

This latter executive order became effective March 1, 1915, and was continued in force, and under it rent was charged against employés of the Panama Canal and the Panama Railroad Company for three months thereafter. On May 23, 1915, the President made the following executive order, superseding or suspending the operation of the above-mentioned order of January 15, 1915: "By virtue of the authority vested in me, it is hereby ordered that the executive order of January 13, 1915, relative to charges for rent, fuel and electric current, furnished employés of the Panama Canal and the Panama Railroad Company on the Isthmus of Panama, is modified by suspending from the operation thereof so much as relates to rent, fuel and lights during the period of actual construction of the Panama Canal but not later than June 30, 1916."

It must be observed that during the time for which Judge Jackson is sought to be charged for the rent of the residence and for lighting the same there was no statute or executive order authorizing the making such charges and there is therefore no authority for withholding the salary. In other words, prior to March 1, 1915, there was no authority to charge or collect from any one rent for houses or quarters, or for lighting the same, on the Canal Zone. It is manifest that prior to that date it had not been contemplated by Congress, or by the Secretary of War, or by the Canal Zone officials, that rental charges would be made for the occupancy of quarters, and lights, on the Canal Zone. The houses were erected, not for rental purposes, but for the use of the employés of the Panama Canal, the Panama Railroad, and other governmental functionaries who might from time to time, in the discharge of their official duties, be required to reside in the Canal Zone. The purpose of the United States in acquiring the Canal Zone was to use it as a necessary appurtenance for the construction of the Isthmian Canal—for auxiliary works of canal construction, such as abodes for housing employés, and the like. It will not be insisted that it was the intention of the United States to engage in the real estate business for profit, or that there was any intention on the part of Congress that a rental should be charged against judicial or other officers who were obliged to live in the Canal Zone.

Moreover, the order of March 1, 1915 (above quoted), was the only provision of law for the collection of rents from any one, and that order applied to employés of the Panama Canal and the Panama Railroad, and not to the District Judge of the Canal Zone. But treating the judge as an employé, then we find that for a period of three months less six days, the executive order, authorizing the collection of rent from employés of the Panama Canal and the Panama Railroad, was operative, and that it was then suspended as to the persons or class of persons to whom it had been made applicable, namely to the employés of the Panama Canal and the Panama Railroad Company. This executive order which authorized the collection of rent from the employés was suspended during the time of the occupancy of the house by Judge Jackson, and for which he is charged rent by the respondent. It must therefore be held that there was an absence of authority on the part of any one to make such a charge.

It may be well to remember in this connection that no private persons could erect a house on the Canal Zone for his individual use. The judge was required by act of Congress to reside in the Canal Zone, and under the circumstances it was not possible for him to do so except by living in one of the houses owned by the government. That he should occupy such house seemed to have been understood as being in the contemplation of Congress. In the absence of any legislative expression, it cannot be believed that it was the intention of Congress that the judge, whose office was created by the Congress, and who was required to reside in the Canal Zone, should rent quarters from the government or from any subsidiary governmental agency.

9. But the respondent contends that he has the right to withhold a part of the salary of the judge, fixed and appropriated for by law, because the Adamson Act provides that the judge shall not receive any emoluments except his salary. Pretermitting for the time being the consideration of other phases of the case or questions, let us ascertain the meaning of emoluments. The definition of the term is ascertained from adjudged cases cited in Words and Phrases, vol. 3, p. 2367, where it is said: "Emolument is the profit arising from office or employment; that which is received as compensation for services, or which is annexed to the possession of office, as salary, fees, and perquisites." I think it may be said, therefore, that an emolument is something positively and directly conferred, as compensation or gain, that the holder of an office receives, and not something necessarily, inseparably, and incidentally used by him in the discharge of his duty, a duty for which he is paid a fixed salary. Certainly it would not be contended that an employé, for instance, a locomotive engineer, could be charged for the use of the locomotive which was necessary in the performance of work he was hired to do. We must not forget that it was the expressed intention to have the judge reside in the Zone, and this intention is just as plain as was the other intention that he should

perform judicial work. His physical presence on the Zone was required, and he could not possibly obtain a habitation there except from the government.

This question here is analogous to the one involved in McCoy v. Handlin, 35 S. D. 487, 153 N. W. 361, L. R. A. 1915E, 858. In that case the contest was over an extra allowance of a specified sum per month to such judges of the Supreme Court as take up their residence at the capitol (of South Dakota), to meet the extra expenses thereby caused. The Constitutional provisions of the state were that: "They [the Supreme Court judges] shall receive no fees or perquisites whatever for the performance of any duties connected with their offices. It shall not be competent for the Legislature to increase the salaries of the officers named in this article except as herein provided." And, again, that: "The judges of the Supreme Court  *  *  *  shall each receive such salary as may be provided by law, consistent with this Constitution, and no such judge shall receive any compensation, perquisite or emolument for or on account of his office in any form whatever, except such salary." An extra allowance by the Legislature of a specified sum per month for such of the judges of the Supreme Court as take up their residence at the capitol, to meet the extra expenses thereby caused, was held not to be inhibited by the constitutional provisions quoted. The proceeding there was for mandamus against the auditor for the allowance of a specified sum to such of the judges as had taken up their residence at the capitol, etc., and was resisted by the auditor upon the ground that the allowance of such sum per month was in contravention of the state Constitution. The decision of the court was against the contention of the auditor. The opinion was well considered, instructive, and is illuminating in the consideration of the instant case. There it was said: "It is clear that the Legislature did not intend, in the enactment of such legislation, to increase the salaries of the judges, or to grant them any perquisites or emoluments for the discharge of their duties, but only intended to assure them, in so far as possible, that for the performance of their official duties alone, and not for the performance of such duties and the payment of the expenses incident thereto, they should receive the salaries provided by law for the performance of such duties." And, again, the court said: "These men [the framers of the Constitution of South Dakota] must have known that section 1, art. 2, of the federal Constitution declared that the President should receive for his services a compensation 'which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period any other emolument from the United States or any of them.' These men must have known that the word 'emolument' was, as recognized by every authority, a term broad and comprehensive, one which includes within it 'perquisites,' 'salary,' 'compensation,' 'pay,' 'wages,' and 'fees.' These men must have known that, with the above provisions of the federal Constitution in force, the Congress of the United States, a body of men which at all times during the history of this government has had among its members many of the greatest constitutional lawyers of the day, had enacted legislation under which the President, for nearly a century prior to the framing of our Constitution, had been furnished a home, horses, carriages, servants, household equipment, and many other things incidental to and appropriate to his high office. These men must have known that such federal legislation had never been questioned either as regards its propriety or its constitutionality. These men must have known that in practically every state in the Union (in many of which there were constitutional provisions similar to the one above referred to in the federal Constitution and to the ones relied upon by defendant in this case) there had been legislative enactments making provisions for the several Governors similar to those made by the federal Congress for the President, as well as innumerable measures appropriating money to be paid other officers to recompense them for expenses incurred in the discharge of their official duties. Is it possible for any one to presume that these men, with all these facts in mind, intended, by the words used in our Constitution, to prohibit allowances for expenses incident to the discharge of public duties? Further light has since been thrown upon the construction given to the provision of the federal Constitution above referred to by the act of June 23, 1906 (34 Stat. at L. 454, c. 3523

[Comp. Stat. 1913, § 225]), which provides: 'That hereafter there may be expended for or on account of the traveling expenses of the President of the United States such sums as Congress may from time to time appropriate, not exceeding $25,000 per annum, such sum when appropriated to be expended in the discretion of the President and accounted for on his certificate solely.' Under appropriations thereafter made by Congress, Presidents Roosevelt and Taft received, and to-day President Wilson is receiving, thousands of dollars each year. So far as we know, it has never been suggested that the money so allowed was an 'emolument,' and therefore unconstitutional. No one has ever seen fit to accuse these Presidents of being grafters. The judges of the federal courts, whose salaries are fixed by a law, declaring that such salaries shall be the 'compensation for their official services,' draw from the United States Treasury a sum not exceeding $10 per day when absent from the places of their residence. Act March 3, 1911, c. 231, § 259, 36 Stat. at L. 1161 (Comp. Stat. 1913, § 1236). This allowance is not given as an increase of salary but to cover the expenses incident to their being away from home in the discharge of their duties."

Paraphrasing, it may be said that the use of the house by Judge Jackson cannot be held to be an increase of salary, but was no more than the necessary inseparable incident to his compliance with his positive duty to reside within the Canal Zone during the term of his office. Section 8, supra, vol. 37, pt. 1, U. S. Stat. at L. 62d Cong. p. 565. The relator was compelled to reside within the Canal Zone, and necessarily could occupy no house except one furnished by the government. It seems fair to say that if Congress had intended the judge to pay rent for the occupancy of a house in the Canal Zone, when it required him to reside there, it must be presumed that it would have been so stated in the Adamson Act. The lawmakers knew that the United States government was the owner of all buildings in the Canal Zone, and that the judge required to reside there must occupy one of those buildings. By way of re-enforcement of this view it may be said that the members of Congress were familiar with the fact that under the acts or ordinances of the Isthmian Canal Commission the former members of the Canal Zone judiciary had occupied houses free of rent. Act 1 of the Isthmian Canal Commission of August 16, 1904, in referring to each of the Circuit and Supreme Court judges, provided as follows: "During his term of office he shall be furnished a dwelling house or apartment, or in lieu thereof a sum of money equal to 8% of his annual salary, at the option of the Commission."

The Adamson Act continued in operation all the acts of the Isthmian Canal Commission not repugnant to the provisions of that act itself. This is shown by section 2, of the act as follows: "That all laws, orders, regulations, and ordinances adopted and promulgated in the Canal Zone by order of the President for the government and sanitation of the Canal Zone and the construction of the Panama Canal are hereby ratified and confirmed as valid and binding until Congress shall otherwise provide. The existing courts established in the Canal Zone by executive order are recognized and confirmed to continue in operation until the courts provided for in this act shall be established." This provision has direct reference to the courts; consequently, when the act required the judge to reside within the Canal Zone, his occupancy of a house belonging to the government or its subsidiary, in the Canal Zone, free of rent, when there had never been any stipulation for the payment of rent, cannot be considered an emolument. It was no increase of salary. It was no profit. His occupancy of the house as a residence constituted an incident, and perhaps also an inducement, to the discharge of his duty while away from his home in the United States.

[11] In his letter, introduced in evidence in this case, the Attorney General of the United States, Mr. Gregory, when called upon by the Governor of the Panama Canal and the auditor, the respondent here, to pass upon the legality or illegality of withholding from the relator his salary, cited with approval the Benedict Case, supra, and appropriately said that the question which the auditor, respondent here, has taken upon himself the authority to decide, and to finally decide, "was one for judicial rather than administrative determination, and that it was a claim that could only be enforced through proceedings

in the courts." Mr. Gregory is not the only Attorney General who has passed upon cases involving this question. On June 27, 1893, Mr. Maury gave the opinion, as to the right of the Secretary of the Treasury to withhold from the salary of a federal judge an amount which had been adjudicated against him in favor of the United States, in a final judgment (Ops. Atty. Gen. 20, 626), as follows:

"Sir: It appears by the letter of the First Comptroller of the Treasury of May 27, ultimo, addressed to you, that the United States has recently recovered a judgment in the Supreme Court of the District of Columbia against the Hon. Nathan Goff, as surety on the official bond of James M. Ewing, formerly disbursing clerk of this department, for the sum of $9,000.00 with interest and costs, and you have referred the letter to me for an opinion upon the following questions presented therein:

"1. Does the act of March 3, 1875 (18 Stat. 481), authorize and require the Secretary of the Treasury to withhold the salary due a public officer who is indebted to the United States?

"2. If so, is there any exception in the case of a federal judge?"

"As I may not, however, give an opinion on a hypothetical question without exceeding my power as defined by law, I must, in complying with your request, confine myself to the case calling for the action of your department, and shall accordingly proceed to consider whether Act March 3, 1875, c. 149 (18 Stat. 481 [Comp. St. 1916, § 6407]), authorizes and requires the Secretary of the Treasury to withhold Judge Goff's salary as a Circuit Judge of the United States for the Fourth Circuit, until the judgment recovered against him as aforesaid shall have been satisfied in that way.

"The act of March 3, 1875, is entitled 'An act to provide for deducting any debt due the United States from any judgment recovered against the United States by such debtor,' and provides as follows: 'That when any final judgment recovered against the United States or other claim duly allowed by legal authority, shall be presented to the Secretary of the Treasury for payment, and the plaintiff or claimant therein shall be indebted to the United States in any manner, whether as principal or surety, it shall be the duty of the Secretary to withhold payment of an amount of such judgment or claim equal to the debt thus due to the United States.'

"It would be, in my judgment, to abandon the ordinary sense of language and to adopt an unlooked for interpretation to hold that it was in the contemplation of Congress to include, under the expression 'claim duly allowed by legal authority,' the right of a federal judge to have his salary paid to him out of money in the Treasury appropriated by law for that purpose.

"The allowance of a claim against the United States involves a discretion which partakes of a judicial character, but it is apparent that there is no room for the exercise, by any 'legal authority,' of such a discretion with reference to the salary of a judge, which the law requires to be paid, if there is money in the treasury applicable to it, and failure to pay which is an official delinquency which may be summarily corrected by mandamus.

"Without going into the constitutional question and the question of policy suggested in the First Comptroller's letter, I content myself with saying that this is not a case where the ordinary sense of the language of the statute should be extended by construction."

In addition, Attorney General Black, under date of July 21, 1858, rendered an opinion (9 Ops. Atty. Genl. p. 198), an excerpt of which reads as follows: "Though I doubt the power of the Secretary of the Treasury in the present state of the law to set up a counterclaim of any kind in order to avoid payment of a judgment which Congress has ordered him to pay, yet I do not think there would be impolicy or danger of giving him such power, where the counterclaim is also a judgment, or where it is established by evidence so conclusive that the opposite party is estopped from denying it. In such a case, he would be required to pass on nothing which is open to dispute. His function would be merely ministerial, consisting in nothing but the subtraction of one claim from the other and ascertaining the difference. But here is a claim fiercely contested. It has never been adjudicated in favor of the government. If it has ever been passed upon by any court, the judgment was

against it. There is not a word on record about it. All the evidence concerning it pro and con is in pais. Every fact asserted by one party is not only open to contradiction by the other, but is in fact contradicted, and I have no doubt is most potently believed to be untrue. Not only are all the facts vehemently disputed, but the parties are as wide asunder as the poles on every question of law. It is proposed that this complicated entanglement shall be settled in the chamber of an executive officer, without a trial, without a judge or jury, without examining witnesses, and without hearing counsel. No such jurisdiction is given to the Secretary of the Treasury by any law, and if the Constitution is not a dead letter, Congress cannot confer it. The fifth amendment declares that 'no person shall be deprived of his life, liberty or property, without due process of law.' This means, and has always been held to mean, that the right of a citizen to his property, as well as his life or liberty, could be taken away only upon an open, public, and fair trial before a judicial tribunal, according to the forms prescribed by the law of the land for the investigation of such subjects. If an executive officer can make an order that the widow and children of Reeside shall be deprived of $24,000 without a trial, then the same officer may, with equal propriety, issue a warrant to hang them, since the Constitution puts life and property on the same footing. * * * If Congress had power to confer this kind of jurisdiction on the head of the Treasury Department, and would exercise it by passing a law to invest him with all the authority which courts and juries together are clothed with by any defalcation act ever passed, still the Secretary could not set off this claim against that of Mrs. Reeside. Her demand is res adjudicata—fixed and settled by a judgment—and the payment of it in full is sanctioned by an act of Congress. The counterclaim of the Government rests on parol evidence disputed and denied. Now, it is well settled that where one party has a judgment the other can never set off against that judgment a claim not reduced to judgment, however clearly he may be able to prove it. He is always remitted to his action. For these reasons, and for others which might be adduced, I am perfectly satisfied that the Secretary of the Treasury has no power to stop the payment of the money adjudged to Mrs. Reeside, however well he may be satisfied in his own mind that the counterclaim is well founded. If he is convinced of the indebtedness alleged, he should order a suit to be brought, and give the party a fair chance to be heard before the regular tribunals of the country. I am not aware that such power was ever claimed before it was used by the late Secretary in this case; but if it be a practice of the department it ought to be immediately abolished, for it is unjust, unlawful, and unconstitutional." This language is apposite in the present controversy.

As to the force and legal effect of an official opinion of the Attorney General of the United States when rendered to any executive or administrative officer we can do no better than to refer to the opinion, rendered to the Secretary of the Treasury on date of February 12, 1894, by the Attorney General, Richard Olney (Opinions of Attorney General, vol. XX, 722) as follows: "The act of 1870, section 4, establishing the Department of Justice, provided that written opinions prepared by a subordinate in the department may be approved by the Attorney General, and that 'such approval so indorsed thereon shall give the opinion the same force and effect as belong to the opinions of the Attorney General.' This provision is embraced in substantially the same language in section 358 of the Revised Statutes. Evidently, therefore, Congress contemplates that the official opinions signed or indorsed in writing by the Attorney General shall have some actual and practical force. Congress' intention cannot be doubted that administrative officers should regard them as law until withdrawn by the Attorney General or overruled by the courts, thus confirming the view which generally prevailed, though sometimes hesitatingly expressed, previous to the establishment of the Department of Justice." 3 Opin. 97; 6 Opin. 334; 7 Opin. 699, 700; 9 Opin. 35, 37. The question now presented is substantially the same as that presented last summer. The duty of this department ended with the rendition of the opinion, and it cannot with propriety advise further." 17 Opin. 332.

Mr. Attorney General Gregory was correct in saying that if the authorities

in the Canal Zone believe that the relator in the present case owed any amounts of money whatsoever to the Panama Canal it was "a question for judicial rather than administrative determination," and that the claim now urged by the respondent in this case "could only be enforced through proceedings in the courts." That is a sententious and felicitous statement of this case.

Judge Jackson has never had his day in court. He has been deprived of his salary, or the sum of $1,131.76, without due process of law. It has been withheld from him by the refusal of the auditor in this case to issue his voucher upon which the salary is paid. The indebtedness is denied by Judge Jackson. He denies it upon the grounds that there was no law or regulation under which the indebtedness was or could have been created. He denies that the respondent has authority to withhold any part of his pay in the collection of an alleged but disputed indebtedness. And yet the executive officer has sat as a court, and, without evidence or hearing, except what he considered evidence, and except what he considered a hearing, decided a controversy that he created by his own action. He has passed upon a disputed claim which is a disputed claim merely because he has created the dispute in refusing to make payment where it was his plain duty to make such payment. His conduct, however good his intention may have been, hardly falls short of being shocking to the judicial sense of justice, proper and orderly procedure, in a matter that is clearly justiciable. Perhaps it is not to be doubted that, if, after he had made a careful examination, the Attorney General had found Judge Jackson was indebted, owed the items amounting to the salary which has been withheld by the auditor, the account would have been settled without court proceedings, or, if not so settled, then appropriate court action would have been had for its collection. In any event Judge Jackson was entitled to his day in court. But the auditor here held that, having the money for Judge Jackson under his control and subject to his disbursement, he had the right to determine the claim against Judge Jackson, one disputed in law and in fact, and now insists that his summary way of determining an issue of law and an issue of fact, and the collection by deduction from the judge's salary of a disputed indebtedness, cannot be reviewed or questioned by the court. Notwithstanding that view, I think the Attorney General was right in saying that the matter "was one for judicial rather than administrative determination," and that whatever demand or offset that the government may have "could only be enforced through proceedings in the courts."

The counsel for the respondent in the oral argument before me insisted that Gratiot v. United States, reported in 15 Pet. 336, 10 L. Ed. 759, authorizes the respondent to retain as an offset the amount claimed by him to be due from Judge Jackson. The following quotation shows the ruling in that case: "There is another instruction asked under this exception, in a complicated form, but which mainly turns upon a consideration whether the Treasury Department had a right to deduct the pay and emoluments of the defendant, as a general of the army, and while he was chief engineer, by setting them off against the balance reported against him, on account of his superintendency of Forts Monroe and Calhoun. In our judgment, the point involves no serious difficulty. The United States possess the general right to apply all sums due for such pay and emoluments to the extinguishment of any balances due to them by the defendant on any other account, whether owed by him as a private individual or as chief engineer. It is but the exercise of the common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." The opinion in that case does not sustain the contention of the respondent that treasury officials have the right to make deductions from salaries of other officers whenever, in the opinion of treasury officials, such officers may be indebted to the United States. An examination of the opinion in that case shows that no such broad principle as that contended for was declared. The facts of that case are essentially different from those in the instant one. Gen. Gratiot was a disbursing officer of the United States Army, and as such he had drawn large sums of money from the federal treasury on warrants signed by himself. He later converted to his own use the sum of $30,000.00 from one of the sums which had been drawn by him for engineering work under con-

struction. In the statement of the Attorney General it was asserted that Gen. Gratiot made no objection to the stopping of his pay. He contended, and contended only, that the amount of his defalcation should be credited to an account other than that to which the treasury officials had credited it. He insisted that the $30,000 embezzled by him should be charged to a particular account that he favored. The court decided in effect that the United States had a right to apply the portion of Gen. Gratiot's salary then due and owing to any of the accounts as it saw fit he had admittedly settled, being a defaulter on all of his accounts.

As has been shown, the amount of the relator's salary had been fixed by law, and the money for its payment appropriated, and was by the terms of the law in the possession or under the control of this respondent as disbursing officer, and he, as such, was under the legal obligation to pay, or under the regulations and practice to do his part in the payment of, such salary. There was nothing left to be determined by his judgment or according to his discretion. The judge having served as judge, the law itself automatically audited and determined the amount to be paid to him. The case of McCoy v. Handlin, supra, is, I think, in point as I have endeavored to show, for there it was said: "On the other hand, where the amount claimed is fixed by law, as, for instance, an officer's salary, the auditor is vested with no discretion whatever. If he is satisfied as to the identity of the officer, claiming a salary, it is his duty to issue his warrant for the amount so fixed. In that case, there is nothing to be determined by an action at law, and, if the auditor refused to issue the warrant, mandamus is a proper remedy to compel him to issue the same."

In Fowler v. Peirce, 2 Cal. 165-167, the court said: "It is true that courts cannot compel judicial or other officers vested with legal discretion to act otherwise than in the exercise of that discretion. In the present case, it is the duty of the Comptroller to audit the appellant's account. The nature and amount of the services are ascertained, or not disputed, and the law has fixed a compensation. The Comptroller, who is bound to know the law by which he is required to act, has no discretion in such a case. Nothing remains to be ascertained. He must audit the account according to the law in force; and it will be no sufficient answer to a mistake or refusal on his part to say he acted according to his discretion. The act of auditing an account, under circumstances like these, becomes merely ministerial, and can be enforced by mandamus."

In State, etc., Collens v. Jumel, Auditor, 30 La. Ann. 861-864, the court declared: "When a judge has acquired his office in the mode designated by the Constitution, he has a vested right to its emoluments during the term fixed by the Constitution for its duration. The Legislature cannot deprive him of it. He may be impeded in the exercise of his judicial functions. He may be shorn of judicial power, and be deprived of the opportunity to discharge the duties imposed upon him by the acceptance of his office, but he cannot be divested of the office except by one of the modes appointed by the Constitution for that purpose, and he cannot be denied his just demand of payment of the salary, which is prohibited from being increased or diminished during his term. All devices tending to abrasion of the independence of the judiciary, or to subject it to legislative or popular caprice, have been uniformly condemned by the wisest men of our country. Numerous incidents have occurred in the states of attempts of the Legislatures to oust judges from their constitutional offices, and deprive them of their salaries, and in no instance has the doctrine announced in the relator's case in the Twenty-Sixth Annual found any favor. * * * The independence of the judicial department of the government is at once the anchor of our stability, the prop of our strength, and the shield of our defense. * * * The relator is entitled to his salary for the term of his office, not included in his former suit, and the respondent should have audited his claim therefor to the extent of the appropriations, and drawn the warrants upon the treasury in accordance therewith." In the case last above cited it appears that the auditor did not have the funds sufficient to pay the salary of the judge, but nevertheless the writ of mandamus issued for such funds as he did have to apply to the payment of the salary

of that judge. It apparently had been sought by the Legislature of Louisiana to legislate the relator in that case out of office, and, although the relator, by reason of the act of the Legislature, had no judicial function to perform for a considerable period of time, nevertheless the Supreme Court of Louisiana held that he was entitled to his salary irrespective of the fact that he had not performed the duties of his office, and that mandamus would lie to compel the payment of his salary.

It seems to me that upon reason and authority, when the salary has been fixed by law and the money appropriated for its payment, that the officer who controls the funds refuses to pay the salary to the one entitled thereto, mandamus is the proper remedy and the only remedy which the aggrieved party can invoke for the protection and enforcement of his rights.

Counsel for the respondent cited the case of Butterworth v. United States, 112 U. S. 50, 68, 5 Sup. Ct. 25, 34 (28 L. Ed. 656), in support of his contention that mandamus would not lie in the present case. That case not only does not support this contention, but it expressly negatives it. There the superior of the Commissioner of Patents, the Secretary of the Interior, had overruled the Commissioner, who had already exercised his judgment and discretion in deciding that the relators were entitled to a patent. The Supreme Court of the United States stated that, irrespective of the action taken by the superior of the Commissioner, the writ of mandamus would lie, directing him to issue the patent. The court said: "Some question is made as to the remedy. We think, however, that mandamus will lie, and that it was properly directed to the Commissioner of Patents. He had fully exercised his judgment and discretion when he decided that the relators were entitled to a patent. The duty to prepare it, to lay it before the Secretary for his signature, and to countersign it, were all that remained, and they were all purely ministerial. These duties he had failed and refused to perform merely out of deference to the claim of the Secretary to reverse and set aside the decision on the merits in favor of the relators. This we have held not to be a valid excuse."

10. It will be noted that the respondent has withheld $83.33 of Judge Jackson's salary for five days' absence from the Canal Zone in excess, as it is alleged, of the six weeks' annual vacation allowed under the Adamson Act. It is thus seen the respondent was under the misapprehension that Judge Jackson was to be classed as a day-laborer, and that it was his duty as auditor, so he contends, to "dock," to use the respondent's language as a witness on this trial, Judge Jackson's salary on account of alleged absence. Of course any laborer is respected, for labor is honorable, but the judge was not engaged to work by the hour or day. It is sufficient to say that the Act of Congress provided that Judge Jackson should be paid an annual salary of $6,000 just as United States District Judges are paid, and he was given by statute an annual leave of six weeks; and that this does not preclude the idea that he could lawfully have a longer leave of absence. Undoubtedly he could have been granted a longer leave, and undoubtedly the judge could not be deprived of the six weeks allowed by the statute. If without authority Judge Jackson absented himself from the Canal Zone for a period of time not permitted the remedy for such dereliction was not committed to the judgment or authority of the respondent. For such an excess the judge was amenable to the President, with his power of removal, or to Congress, with its power of impeachment.

The Adamson Act does not provide for vacation for the marshal or the district attorney, and yet they have taken their vacations and the respondent made no deduction from the salary of either on that account. Presumably he did not make any deduction because they, perhaps, took leave or vacation by the consent of some executive functionary. It is rather strange, to say the least of it, that this respondent should now insist he has the right to withhold a part of Judge Jackson's salary for five days' absence in view of the fact he was informed that the Attorney General, the head of the Department of Justice, advised that the judge's explanation as to why he had been absent for the brief time mentioned was entirely satisfactory. And, moreover, it is stranger still that this respondent should withhold the five days' pay from the judge in view of the fact that the Comptroller of the Treasury, upon

whom the respondent says he relied for direction, never advised him to make any such deduction.

I do not believe that law or propriety justified the respondent in this case to exercise the espionage or petty supervision over the time, services, and whereabouts of the judge as was shown by the testimony on the trial. The testimony in the case warrants the statement that the judge was faithful, efficient, and independent in the discharge of the duties of his office. And testimony, introduced at the trial without objection, showed that Judge Jackson had so properly and fearlessly adjudged in a case before him as to bring forth, from the respondent, a published criticism upon the decision by the judge in that given case. But the judge was independent of him, and if he is to continue to be independent of the respondent, as a judge ought to be, he should not be subservient to the respondent for his salary or compensation.

In deducting $83.33 from the salary, for the alleged five days' absence of the Judge, the respondent exceeded his authority.

My conclusion is that the withholding of $1.131.76 of Judge Jackson's salary was without authority of law; that it is the duty of respondent to issue his warrant or pay voucher for the same; that mandamus is the proper remedy to compel the respondent to perform this ministerial duty; and that, therefore, the peremptory writ of mandamus must be issued as prayed for.

It is accordingly adjudged and ordered, and in accordance with the said opinion the court finds the issues in favor of the relator and against the respondent, and orders that the writ prayed for shall issue, and thereupon final judgment herein is entered and the writ issued.

Charles R. Williams, U. S. Atty., of Ancon, Canal Zone, Walter W. Warwick, Comptroller of the Treasury, and B. F. Harrah, both of Washington, D. C., for plaintiff in error.

Stevens Ganson, of Panama, Republic of Panama, Lamar C. Quintero, of New Orleans, La., William C. MacIntyre, of Colon, Republic of Panama, and Chauncey P. Fairman, of Cristobal, Canal Zone, for defendant in error.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

PER CURIAM. The elaborate opinion of Judge Clayton covers the entire case, and fully justifies the judgment rendered.

We find none of the assignments of error well taken.

Judgment affirmed.

---

SPARKS et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1917.)

No. 2817.

1. POST OFFICE ⬤═35—FRAUDULENT USE OF MAILS—SCHEMES TO DEFRAUD.

Where defendants were charged with using the mails in furtherance of a scheme to defraud depositors and creditors of a bank by false representations as to its financial condition, the bank's actual solvency, in the sense of having assets of value in excess of its liabilities and the ultimate collectibility of loans to the bank, was not conclusive against an intent to defraud, as creditors were defrauded, within the meaning of the law, if induced to part with their money by materially false representations of the bank's financial condition and its ability to pay its indebtedness as it matured in regular course, and thereby subjected to substantial risk of failure to recover their money in full.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55.]